# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN WILLIAMS, | ) |
| Plaintiff, | ) |
| v. | ) No. 16-cv-3313 |
| EXTRA SPACE STORAGE, INC., | ) Judge John J. Tharp, Jr. |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This case presents the not-uncommon question of whether an employee was fired for misconduct or on account of his race. Plaintiff John Williams alleges that his former employer, Defendant Extra Space Storage, Inc. ("Extra Space"), which operates self-storage facilities, terminated him from his position as a Store Manager because he is African American. Extra Space maintains that it terminated Williams because he violated company policy by failing to require a customer to sign a rental agreement in connection with her use of a storage unit, not because of Williams' race. Williams says that he was properly exercising his managerial discretion to assist the customer, so the company's explanation is a pretext. Firing Williams for trying to accommodate a customer may, or may not, have been a good business decision, but that is not the issue. The question here is whether the company fired Williams on account of his race. And because Williams has not provided any evidence upon which a reasonable jury could conclude that its policy was enforced against him because of his race, Extra Space's motion for summary judgment is granted.

# BACKGROUND[1]

Storage USA, a storage company, hired Williams in 2001. In 2005, Extra Space acquired Storage USA from General Electric. At the time of the acquisition, Williams worked as a manager at Storage USA's (and later Extra Space's) Joliet facility. In June 2006, Extra Space offered Williams the position of Store Manager at Extra Space's Wabash facility, which was only 15 minutes from his home; Williams accepted and remained in that position until September 2015, when the events relevant to this lawsuit occurred. As Store Manager, Williams had more responsibility than his assistant managers and was responsible for the daily operation of the store.

On September 17, 2015, Williams granted an existing customer's request to store items temporarily in a vacant unit she was not renting or leasing while she rearranged the items in her rented unit. Williams left a tag on the vacant unit to signify that the unit was vacant and ready to be rented, left the unit unlocked, and asked the customer to lock it when she was done using it. Williams did not require the customer to sign a new rental agreement for the additional unit she was using and did not create any other record documenting her use of the unit or the items she was storing in it. Nor did Williams know what items the customer was storing in the additional unit. Williams did not ask his supervisor, Mitchell Pope, if he could allow the customer to store items in the vacant unit.

Pope discovered that Williams had allowed the customer to use the storage unit without a rental agreement and subsequently terminated Williams' employment on September 24, 2015. Williams says that initially, neither Pope nor Extra Space's human resources representative could

---

[1] Because this is Extra Space's motion for summary judgment, the facts are construed in a light most favorable to Williams. *See Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

identify a specific policy that Williams violated, but Pope later issued a "final employee counseling form" explaining the reason for terminating Williams, which read as follows:

> John Williams violated [Extra Space] policy by allowing a customer to store items in a vacant unit without obtaining a lease, nor renting the unit to the customer. The customer's items remained in the unit until 9/18/15 when the customer asked the assistant manager on duty to remove the lock from the unit so she could retrieve her belongings. The unit was locked with an Extra Space company lock and displayed a QC tag indicating the unit was cleaned and ready to rent.
>
> In order to maintain a consistently high-quality, professional working environment, the Company expects employees to adhere to certain general business practices that support the basic philosophies and principles of operation.

Def.'s Statement of Material Facts ("DSOF") ¶ 19, ECF No. 93. Pope's supervisor and Extra Space's human resources department agreed with and approved of Pope's decision to terminate Williams. Pope also testified that "allowing a customer to store his or her belongings in a storage unit without a rental agreement violates Extra Space policy," and that he terminated Williams because he allowed a customer to store items in a unit without a rental agreement. DSOF ¶¶ 20–21, Ex. 4, Pope Decl. ¶ 4, ECF No. 93-5.[2] According to Pope, "getting a rental agreement is so fundamental to [Extra Space's] business" because "[i]t's the primary protection for Extra Space and for customers, and it really governs the relationship that [Extra Space] ha[s] with [its] customers." DSOF ¶ 25, Ex. 2, Pope Dep. 118:13–119:7, ECF No. 93-3. Pope's supervisor,

---

[2] Williams testified that Pope told the customer that Williams was not discharged for allowing the customer to use the empty storage unit but rather for "something else." Pl.'s Statement of Additional Material Facts ("PSOF") ¶ 12, ECF No. 102; PSOF, Ex. A, Williams Dep. 285:2-15, ECF No. 102-2. Although the statement from Pope to the customer is likely not hearsay, *see* Fed. R. Evid. 801(d)(2)(D), the second layer of hearsay—the statement from the customer to Williams—is inadmissible as an out-of-court statement offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(a)–(c), 802, 805. "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

3

Divisional Vice President Matthew Walker, testified that "[a]llowing a customer to store belongings in a storage unit without a rental agreement or a lease not only violates the basic tenets of Extra Space's business, but it also exposes Extra Space to potentially significant liability." Def.'s Resp. to PSOF ¶ 4, ECF No. 107; DSOF Ex. 5, Walker Decl. ¶ 6, ECF No. 93-6.

Williams does not dispute that he allowed a customer to use the unit without a rental agreement. He also admits that he violated Extra Space policy by leaving the vacant storage unit in which he allowed the customer to store her items unlocked. DSOF ¶ 27, Ex. 1, Williams Dep. 164:10-17, 166:6-8, ECF No. 93-2. He argues, nevertheless, that his actions were permitted by company policy. Denying the customer's request to store her items in the vacant unit, Williams contends, would have been a bad idea, as the customer would then have been forced to place her property in a walkway or aisle instead, which would have blocked other customers from accessing their units and created a fire hazard. Extra Space's Operations Manual that was in effect in September 2015 provides that "Extra Space is always searching for additional ways to make storing easier and more convenient for our customers. Some markets will require that we do the additional service at little or no cost and others will be able to support a fee for the service. Most importantly, your supervisor must approve any fees charged for these services." PSOF ¶ 6, Ex. A, Williams Dep. Ex. 5, PageID # 1182, ECF No. 102-2. The Employee Handbook in effect at the time calls for Store Managers to provide exceptional service for customers and take necessary steps to ensure the customers' satisfaction. The Operations Manual further provides that "[w]hen a customer has a problem the Store Manager should attempt to resolve it. Our We Care program gives managers the authority to resolve customer problems when they occur." PSOF ¶ 7, Ex. A, Williams Dep. Ex 5, PageID # 1184, ECF No. 102-2.

4

The Operations Manual also states, however, that its "We Care" customer service program "is not intended to replace [Extra Space's] business policies and procedures"; the rental agreement is "the single most important document the customer signs as it spells out the relationship terms between the customer and Extra Space"; "[t]he customer must list a description of the items to be stored along with an estimated value"; and "[n]o customer should be allowed to move into a unit without a signed copy of a rental agreement on file." PSOF Ex. A, Williams Dep. Ex. 5, PageID # 1184, ECF No. 102-2; DSOF Ex. 8, Lawler-Ibarra Decl. ¶¶ 12, 13, Exs. D, E, F, ECF No. 93-9. In at least some situations where customers rented a unit for only a day or a week, those customers were required to sign the same rental agreement that a monthly tenant would sign.

Before Williams was fired, Extra Space had never terminated an employee for allowing a customer to temporarily store her items in a unit without a rental agreement. Williams claims that it was an "established custom and practice" at the Wabash facility and similar facilities, which Pope knew about, for Store Managers to allow customers to move their items from a rented unit to a vacant unit to facilitate the cleaning and organizing of their rented unit. Pl.'s Mem. in Opp'n ("Resp.") 1–2, ECF No. 102; PSOF ¶¶ 3–4.[3] Pope and Pope's supervisor, Matthew Walker, testified that they did not permit any such practice, and Karen McNeal, who was supervised by Pope, testified that Pope did not allow employees to permit customers to use units without renting them.

---

[3] Williams cited portions of the deposition transcripts of Deborah Rogozinski, Tara Hill, and Victor Jones for the proposition that district managers, including Pope, knew about and permitted the customary practice of allowing Store Managers to permit customers to use vacant units. PSOF ¶¶ 3-4. But the cited portions of those transcripts do not suggest that any of them had personal knowledge regarding Pope's practices at the Wabash facility, nor is such personal knowledge apparent from their positions given that those individuals did not work with Pope at the Wabash facility. Def.'s Resp. to PSOF ¶¶ 3–4, ECF No. 107.

5

After Williams' termination, Extra Space filled the Wabash Store Manager vacancy by promoting David Hutcherson, an African-American, from an Assistant Manager position. Pope also later promoted Hutcherson to the position of District Team Lead, a position to which Williams had aspired but, he contends, had previously been denied to him on the basis of his race.

Williams' allegations of discriminatory hiring are part of a series of additional episodes that, he alleges, comprised a discriminatory course of conduct against him by Extra Space during the years leading up to his termination. Williams cites incidents dating back to 2011, when a district manager instructed Williams to clean up the floor and the facility on separate occasions. Williams says the same district manager issued a warning to Williams for leaving his family unattended at the Wabash office. In 2012, a different district manager issued Williams a warning for failing to open the Wabash facility when Williams was on a pre-approved vacation. Williams also contends that in 2012 or 2013, Pope "implicitly accused Williams of stealing inventory by watching only the videotape surveillance of the days and times in which Williams worked and not watching any surveillance footage of non-African American employees." Resp. 4, ECF No. 102.

Pope also issued Williams a warning in April 2015 after Williams twice failed to provide Pope with advance notice that he would be absent from work. Williams contends that employees are only required to obtain pre-approval for absences "if at all possible," and that it was not possible for Williams to obtain pre-approval on one of the occasions "because Williams reported to the job site as scheduled." Resp. 5, ECF No. 102. Within a couple of weeks of when Williams received the warning for failing to obtain pre-approvals for his absences, Alex Luna, a non-African American assistant manager of the Wabash facility, was not disciplined when he failed to obtain pre-approval for an absence. Luna was later promoted to a Store Manager position.

Williams also contends that he worked at Extra Space for fifteen years and exceeded performance expectations but was never promoted above Store Manager even though he applied several times for higher-level managerial positions. Those positions were instead given to non-African American co-workers with less experience than Williams. The most recent occasion when Williams applied for a promotion, however, was in 2012.

In December 2015, Williams filed a Charge of Discrimination against Extra Space with the Equal Employment Opportunity Commission alleging that Extra Space discriminated against him because of his race and age by terminating him, and that it discriminated against him because of his race by disciplining him for taking a sick day. DSOF ¶ 4, Ex. 1, Williams Dep., Ex. 23, Charge of Discrimination, ECF No. 93-2. After receiving a right-to-sue letter, Williams filed suit alleging race and age discrimination in violation of Title VII of the Civil Rights Act of 1964. He has since abandoned his age discrimination claim. DSOF ¶ 5; Pl.'s Mot. to Voluntarily Dismiss Count II, ECF No. 21; Docket Entry Granting Dismissal, ECF No. 23. Extra Space now moves for summary judgment as to Williams' claim of race discrimination.

## DISCUSSION

**I.     Standard**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To succeed on his Title VII claim, Williams must show that "[1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of [his] membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citation

7

omitted). Williams has not advanced a hostile work environment theory of relief. The parties do not dispute that Williams is an African American and therefore a member of a protected class, nor do they dispute that Williams' September 2015 discharge qualifies as an adverse employment action.

Williams' claim survives summary judgment, then, only if the evidence, considered as a whole, "would permit a reasonable factfinder to conclude that [Williams'] race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). While parties may use and the Court may consider the "burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as a 'means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases,' it is 'not the only way to assess circumstantial evidence of discrimination.'" *Abrego*, 907 F.3d at 1012 (citing *David v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)). Here, the parties have used the *McDonnell Douglas* framework in making their arguments, so the Court will address the arguments using that framework as well, bearing in mind that the ultimate question is whether Williams has adduced sufficient evidence of racial animus to support a jury verdict in his favor.

## II. A reasonable jury could not conclude that Williams was terminated because of his race.

To establish a prima facie case under the *McDonnell Douglas* framework, Williams must demonstrate that "(1) []he is a member of a protected class, (2) []he was meeting the defendant's legitimate expectations, (3) []he suffered an adverse employment action, and (4) similarly situated employees who were not members of [his] protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If Williams establishes a prima facie case of racial discrimination, the burden "shift[s] to [Extra Space] to articulate a legitimate,

nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). If Extra Space meets this burden, Williams must then "submit evidence that the employer's explanation is pretextual." *Id.* Extra Space contends that Williams has not identified any similarly situated employee with respect to the decision to terminate him and that Extra Space's legitimate non-discriminatory reason for terminating him was not pretextual. Whether considered under the *McDonnell Douglas* framework or otherwise, Williams has not pointed to sufficient evidence that "would permit a reasonable factfinder to conclude that [his] race . . . caused the discharge." *Ortiz*, 834 F.3d at 765.

### A. No comparable employee

Evidence that one or more similarly situated employees outside the protected class were not disciplined for similar conduct may support an inference of discrimination against an employee within the protected class. *Simpson*, 827 F.3d at 661. "Generally, a plaintiff must show that his comparators dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Monroe v. Indiana Dept. of Transp.*, 871 F.3d 495, 507 (7th Cir. 2017) (internal quotation marks and citation omitted); *see also Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("To determine whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness.") (internal quotation marks and citation omitted). "When the same supervisor treats an otherwise equivalent employee better, one can often reasonably infer that an unlawful animus was at play." *Coleman*, 667 F.3d at 847. But the Seventh Circuit "generally requires a plaintiff to demonstrate at a minimum that a comparator was treated more favorably by the same decision-maker who fired the plaintiff." *Id.* The purpose of applying the "similarly situated" prong of the *McDonnell Douglas* framework "is to eliminate other possible explanatory variables such as

9

differing roles, performance histories, or decision-making personnel, in order to isolate the critical independent variable of discriminatory animus." *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 549 (7th Cir. 2017); *see also Abrego*, 907 F.3d at 1013 ("[T]he comparator must be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable: complaints about discrimination.") (cleaned up). Whether an individual "is similarly situated is typically a question for the fact-finder, unless, of course, the plaintiff has no evidence from which a reasonable fact-finder could conclude that the plaintiff met his burden on this issue." *Reed*, 869 F.3d at 549.

Notwithstanding his allegation in the complaint that "[o]ther similarly situated white employees" were not terminated for allowing the use of rental units without a signed contract, Compl. ¶ 4, ECF No. 1, Williams has not identified any comparable non-African American employee who engaged in similar conduct but was not terminated. Williams testified that four other Extra Space employees allowed customers to store items in vacant storage units. *See* PSOF Ex. A, Williams Dep. 273:11–276:5, ECF No. 102-2. One of those employees, Tara Hill, is an African American. And Williams has not alleged how the remaining three employees were similarly situated to Williams; that is, Williams has not alleged whether those employees worked for Pope, whether they had similar disciplinary records to Williams, whether they were subject to the same standards as Williams, why they allowed a customer or customers to store items in a vacant storage unit, or whether Pope was even aware (or whether other managers were aware) that those employees allowed customers to store items in a vacant unit. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) (holding that plaintiffs lacked relevant comparator where they offered "no evidence about who [the comparator] was, what her position was, who supervised her, why she refused to work in her assigned area, and whether she had a

10

similar disciplinary record and similar performance reviews"). The portions of the deposition transcripts of Rogozinski, Hill, and Jones that Williams cites do not show any personal knowledge that Pope permitted managers to allow customers to use storage units without a rental agreement, nor do the portions of those transcripts identify any employee whom Pope treated more favorably than Williams, let alone explain how any of those employees are comparable to Williams. Not only does the Court have "no idea . . . whether there were any unusual circumstances, mitigating factors, [or] difference[s] in seniority that would [make] the comparison inapt," *id.*, Williams has provided virtually no information about who those allegedly similarly situated employees are.

Williams has also pointed to Alex Luna as a similarly situated non-African American employee with respect to Pope's decision to issue Williams a warning for Williams' failures to provide advance notice of work absences. But there is no evidence that Pope discovered Luna allowing a customer to use a storage unit without a rental agreement (or committed any other act of comparable seriousness) but declined to fire him. Luna is therefore not a candidate to be a comparator with respect to the decision to terminate Williams. *See Coleman*, 667 F.3d at 852 ("To determine whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness.").[4]

Williams has failed, then, to "demonstrate at a minimum that a comparator was treated more favorably by the same decision-maker who fired" Williams, *i.e.*, Pope. *Coleman*, 667 F.3d at 848; *see also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000), *overruled on*

---

[4] As discussed *infra* at 19, there are additional reasons why Luna was not similarly situated to Williams. The Court notes as well that Williams did not identify Elaine Gladdis or Sam Harris, discussed in the Defendant's briefs (*see* Def.'s Mem. 9, ECF No. 92; *see also* Def.'s Reply 7, ECF No. 108), as possible comparable employees in his response brief or statement of facts; the Court, therefore, declines to consider them as comparators. *See Carothers v. Cty. of Cook*, 808 F.3d 1140, 1152 (7th Cir. 2015) (holding plaintiff who failed to identify similarly situated co-workers waived analysis of her comparators).

*other grounds by Ortiz*, 834 F.3d 760 ("[W]hen different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (internal quotation marks and citation omitted).

### B. Failure to meet legitimate expectations

Williams also has failed to create a question of fact as to whether he met Extra Space's legitimate expectations at the time of his termination. The determination of whether Williams met Extra Space's legitimate expectations involves an inquiry into "whether the employer's expectations were legitimate and if so, whether the employee was meeting those expectations" at the time he was terminated. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986). "Although the inquiry into whether the employer's expectations were legitimate is a limited one, the court must determine whether the employer communicated those expectations to the employee and whether those expectations were unreasonable." *Id.* (internal citation omitted).

Williams contends that there is no evidence that Extra Space communicated to Williams the expectation that under no circumstances were customers to be allowed to use a storage unit without a rental agreement. But Williams testified that he was aware that Extra Space required customers to sign a lease and provide a list of items stored, and that Extra Space did not permit employees to leave occupied storage units unlocked. *See* DSOF Ex. 1, Williams Dep. 168:14-23, ECF No. 93-2 ("Q: Does the company require a customer to list the items that are in a unit? A: Yes, they do."; "Q: [D]id you know why Extra Space requires that a lease be signed for a unit? . . . Why are leases required? A: So the tenant can gain possession of their unit. They become owners of the unit."); *see also id.* at 166:6-8 ("Q: With respect to leaving the lock unlocked, does the company allow you to do that? A: No, they don't."). And Extra Space's Operating Manual contains express statements prohibiting the conduct in which Williams engaged. *See, e.g.*, DSOF

12

Ex. 8, Lawler-Ibarra Decl. ¶ 13, Ex. F ("No customer should be allowed to move into a unit without a signed copy of a rental agreement on file.").

Williams also contends that Extra Space's expectations were unreasonable because allowing the customer to use the vacant unit made "storing easier and more convenient," which is consistent with Extra Space's emphasis on customer satisfaction. PSOF ¶ 6. Refusing the customer's request, Williams contends, would have led to the customer's items being stored in a walkway or aisle, thereby creating an obstruction for other customers and a fire hazard. Williams believed that he was authorized to perform these kinds of additional services "at little or no cost" to customers under certain circumstances. *Id.*

But Extra Space's policy to "extend good will to its tenants," Compl. ¶ 12, cannot reasonably be understood to grant managers like Williams the unfettered discretion to disregard other policies and operational requirements. To the contrary, the Operations Manual expressly states that its "We Care" customer service program "is not intended to replace [Extra Space's] business policies and procedures." PSOF Ex. A, Williams Dep. Ex. 5, PageID # 1184, ECF No. 102-2. Williams' authority to engage in customer satisfaction efforts was therefore circumscribed by Extra Space's policies and operating principles emphasizing the importance of securing a rental agreement, making a record of the items stored in a customer's unit, and keeping units locked. Williams failed to secure from the customer a rental agreement, which Extra Space's Operations Manual in effect at the time identified as "the single most important document as it spells out the relationship terms between the customer and Extra Space." DSOF ¶ 23, Ex. 8, Lawler-Ibarra Decl. ¶ 12, Ex. D, ECF No. 93-9. The Operations Manual further provided that "[t]he customer must list a description of the items to be stored along with an estimated value," and that "[n]o customer should be allowed to move into a unit without a signed copy of a rental agreement on file." DSOF

Ex. 8, Lawler-Ibarra Decl. ¶ 13, Exs. E, F, ECF No. 93-9. Granting managers some degree of latitude and discretion to ensure customer satisfaction does not require Extra Space to allow that discretion to be boundless. *Cf. Lindsey v. Walgreen Co.*, No. 08 C 3547, 2009 WL 4730953, at *7 (N.D. Ill. Dec. 8, 2009) (holding that plaintiff failed to establish she was meeting employer's legitimate expectations at time of termination even though she "characterize[d] her decision . . . as an appropriate exercise of professional judgment," because "it was for [the defendant] to decide whether she exercised that judgment properly"). Extra Space has shown that Pope believed that Williams had engaged in conduct that violated Extra Space's policies and core operating principles; Williams was therefore not meeting Extra Space's legitimate expectations. *Cf. Heaton v. Sears, Roebuck & Co.*, 2006 WL 3267679, at *5 (N.D. Ill. Nov. 8, 2006) ("The undisputed facts demonstrate that [plaintiff's] supervisor at the time of her termination[] believed that [plaintiff] engaged in unethical conduct, requiring [plaintiff's] termination. Accordingly, [plaintiff] was not meeting her employer's legitimate expectations.").

    **C.**    **No showing of pretext**

Even if Williams had met his initial burden under the *McDonnell Douglas* framework, Williams has not shown that a reasonable jury could conclude that the reason Extra Space gave for terminating Williams was merely a pretext for terminating him on the basis of his race. To show pretext, Williams

> must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence that the defendant did not act for the asserted non-discriminatory reasons. A plaintiff can do this by showing that the defendant's reason for the adverse employment action (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action. The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.

*Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (cleaned up). "Evidence that the employer has offered false reasons for its actions permits an inference of unlawful discrimination." *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 814 (7th Cir. 2017). The "inquiry is not whether the reason for the firing was a correct business judgment but whether the decisionmakers honestly acted on that reason." *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1291 (7th Cir. 1997).

Williams has not pointed to any evidence suggesting that Extra Space's purported reason for terminating him was dishonest. Williams asserts that Extra Space did not fire any other employees for permitting an existing customer to temporarily shift stored items to a vacant storage unit in order to facilitate the cleaning and organizing of a rented unit. That is true enough, so far as it goes. But the fact that Williams was the first, or only, person fired by Extra Space for a similar infraction does not alone give rise to an inference that he was singled out because of his race. Williams has not adduced evidence that would show that the managers he identifies as also having allowed temporary use of storage facilities without a rental agreement were similarly situated, so they cannot provide a basis for his argument that the rental agreement policy was selectively enforced against him because of his race. Indeed, Williams testified that Tara Hill, another African American manager, was *not* terminated after she allowed a customer to move items into an unleased unit. *See* Williams Dep. 273:11–274:24, ECF No. 102-2. At most, then, Williams has shown that Extra Space generally declined to enforce its prohibition on allowing customers to use vacant storage units **against both African American and non-African American employees.** Whatever may have tilted the enforcement scale toward termination in this instance, this record does not support an inference that it was Williams' race.

That Extra Space replaced Williams with another African American underscores the point that an inference of discriminatory animus is not reasonable here. Williams simply ignores the fact that Extra Space replaced Williams with Hutcherson, another African American male, who was promoted to take the position. Though not dispositive, *see Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996) (*per curiam*), the replacement of one employee with another employee of the same race "undercuts his assertion that the defendant's real motive was race discrimination." *Webb v. O'Malley*, No. 94 C 7435, 1996 WL 526780, at *1 (N.D. Ill. Sept. 12, 1996); *see also Bates*, 726 F.3d at 957 (evidence that plaintiff was replaced by another African American supported conclusion that reason for termination was not pretextual); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1118 n.50 (7th Cir. 1992) (affirming finding of no pretext where plaintiff was replaced with another African American employee). It is difficult to fathom why, if as Williams contends Extra Space wanted to get rid of him because he is African American, it replaced him with another African American.[5] Certainly Williams provides no answer to the question, even though it is his burden to discredit the company's proffered explanation.

In the absence of any other evidence of racial animus, Williams is left to argue that enforcing the rental agreement policy against him amounts to a dumb decision, so racial animus must account for his termination. It is not at all clear to the Court, however, that terminating a manager for authorizing a violation of fundamental company policy constitutes a bad decision by the company, but no matter: Williams' argument merely challenges the merits of the decision and

---

[5] While there may be some occasions when an employer might discriminate between members of the same minority group, *Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008), Williams makes no argument that Extra Space discriminated against him on any basis other than his status as an "African American." He does not, for example, assert that Hutcherson was preferred as between Williams and other African Americans because he was lighter skinned, or mixed race, or possessed some other "racial" characteristic that might distinguish individuals who identify as "African Americans."

the wisdom of the company's policy, not the honesty of the stated reason for the termination decision. The Seventh Circuit "has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999); *see also, e.g., Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006) ("[I]t is not our role to question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination."). Where, as here, Williams has not shown any evidence of bad-faith or dishonesty, it is for Extra Space to decide what conduct conforms to its operating principles; the "court is not a super personnel department that second guesses employers' business judgments." *Riley v. Elkhart Cmty. Schools*, 829 F.3d 886, 895 (7th Cir. 2016) (internal quotation marks and citation omitted). "Plaintiff's dispute with Defendant's interpretation of its policy and with Defendant's decisions based on that policy, without more, does not lead to the inference that his termination was based on his [protected class]." *Deacon v. Peninsula Chicago, LLC*, No. 16-cv-1464, 2017 WL 3531518, at *12 (N.D. Ill. Aug. 17, 2017); *see also Garrison v. Westat, Inc.*, No. 01 C 2918, 2002 WL 335452, at *4 (N.D. Ill. Mar. 1, 2002) ("Title VII does not prohibit employees from making employment decisions based on that which an employee considers a *de minimis* infraction.").

In short, the company's explanation for the termination—that Williams violated an important policy by allowing a customer to use a storage unit without a rental agreement—is race neutral and Williams has identified no reason to treat that explanation as a pretext for racial discrimination.

**III.    Prior acts**

Williams alleges that Extra Space corporate managers engaged in a discriminatory course of conduct against Williams that often resulted in Williams being written up or disciplined without justification. Williams does not allege that these prior discriminatory acts are independently actionable,[6] but rather seems to suggest that those incidents shed light on Pope's discriminatory motive in terminating Williams. Each of the incidents, however, is too attenuated from Williams' termination to have any probative value as to Pope's reasons for terminating him. Even express derogatory "comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question." *Bahl*, 115 F.3d at 1293; *see also Rush*, 966 F.2d at 1116 ("[I]n order to suffice as evidence of racial animus in support of a claim of disparate treatment, the racial remarks must be relatively contemporaneous to the termination of employment and must be related to the employment decision in question.") (internal quotation marks omitted). And here, the incidents Williams identifies are far less suggestive of discriminatory animus than racially derogatory comments would be.

Pope issued Williams a warning in April 2015 for failing to provide advance notice of two absences from work. Around that time, Pope did not issue Luna a warning for failing to provide advance notice of his absence. But Luna was not similarly situated to Williams, so any disparate

---

[6] Nor could he, as those acts are either time-barred or did not involve adverse employment actions. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day period after the discrete discriminatory act occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The only prior discriminatory act Williams alleges that occurred within the 300-day window prior to the filing of his EEOC charge was Pope's April 2015 issuance of a warning to Williams for failing to provide advance notice of his absences. But the mere issuance of a warning is not an adverse employment action. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions.").

treatment between them cannot give rise to an inference that Pope discriminated against Williams by issuing Williams the April 2015 warning (let alone by terminating him in September 2015). Williams, as Store Manager, had greater responsibilities than Luna, an assistant manager. "[E]mployees of higher rank commonly have different job duties or performance standards." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011). Williams also failed to provide advance notice for his absences twice, whereas Luna failed to provide advance notice only once. Even if Luna and Williams had been similarly situated with respect to Williams' April 2015 warning, moreover, Williams has not shown that the warning was sufficiently "proximate and related to" his September 2015 termination such that it would have any probative value regarding Pope's reasons for terminating Williams. *Bahl*, 115 F.3d at 1293; *see also Martino v. MCI Commc'ns Servs., Inc.*, No. 07 C 2627, 2008 WL 2157170, at *7 (N.D. Ill. May 21, 2008) ("[I]t is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.").

As for the inventory audit in 2012 or 2013, the mere fact—which is all that Williams offers—that Pope watched only surveillance footage for the hours when Williams was working does not create a reasonable inference Pope terminated Williams in September 2015 because of his race. Assuming the truth of the assertion (which Pope denies), Williams does not allege that Pope took any disciplinary action or made any discriminatory remarks surrounding that audit; indeed, he testified that he merely assumed that by watching that video, Pope was implying that Williams had stolen the boxes. PSOF, Ex. A, Williams Dep. 293:10-19, ECF No. 102-2; Def.'s Resp. to PSOF ¶ 21, ECF No. 107. Williams tells us nothing else about the video, however, to bridge the gap between his assumption and a reasonable inference of racial animus. And this event is even further removed from Williams' September 2015 termination than the April 2015 warning. *See Harris v. City of Chicago*, 665 F. Supp. 2d 935, 955–56 (N.D. Ill. 2009) (finding two-year gap

between allegedly discriminatory comments and plaintiff's termination "certainly limits any probative value" those remarks might have had).

The other prior acts Williams cites are even less relevant. Those other acts are even older, involve individuals who are not alleged to have had any role in the decision to terminate Williams, and otherwise have not been shown to have any link to the decision to terminate Williams. *See Coleman*, 667 F.3d at 847 ("The inference of discrimination is weaker when there are different decision-makers, since they may rely on different factors when deciding whether, and how severely, to discipline an employee.") (internal quotation marks omitted); *see also Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (discipline from different supervisor "sheds no light" on disciplinary decision); *cf. Filipovic v. K&R Express Sys. Inc.*, No. 95 C 67441, 1997 WL 790593, at *9 (N.D. Ill. Dec. 17, 1997) (finding that discriminatory comment made by non-decision-maker was immaterial). These incidents do nothing to bolster Williams' claim.

\*   \*   \*

For the reasons stated above, the Court concludes that Williams has failed to adduce sufficient evidence of racial animus to support a jury verdict in his favor. Accordingly, Extra Space's motion for summary judgment, ECF No. 91, is granted.

Dated: July 9, 2019

John J. Tharp, Jr.
United States District Judge

20